Bissell, J.,
delivered the opinion of the court..
The involved and complicated history of the transactions between John W. Smith and Charles li. Smith, the appellant, and John E. Leet, compels a very extended statement of facts, although this appeal turns on a single point and our views of the legal principles which must determine the rights of the parties on this basis.
In February, 1883,- John W. Smith was the owner of a large number of lots located in Garden Place, which was a subdivision of a part of the south half of the northeast quarter of section 22, township 3, contiguous to the city of Den *65 ver. This part of the section had been platted and laid out in lots for the purposes of improvement and sale. At that time John W. Smith entered into an arrangement with John E. Leet, which took this form: Smith conveyed the described property to Leet. Leet did not pay the agreed consideration for the transfer, but entered into a contract respecting it, which took this shape: He executed a writing which the parties have termed a “note,” though it lacks the essential features of commercial paper.
“ $15,000.00. Denver, Colo., February 10, 1888.
“Five years after date I promise to pay to the order of' myself, fifteen thousand dollars, for value received, negotiable and payable at The Colorado National Bank, of Denver, Colorado, without defalcation or discount, with interest from maturity, at the rate of 10 per cent, per annum.
“ This note is secured by a deed of trust on real estate, bearing even date herewith, and it is expressly understood and agreed that in case of default in the payment thereof, that the holder'thereof shall in no ease sue the maker or endorser or endorsers thereof, in an action at law, for any amount that may be due thereon, but must look for payment solely to the property given in said deed of trust as security for said note. John E. Leet.”
This contract had an indorsement on’ it as follows:
“ The above note is hereby extended one year from maturity.
“ October 6,1887. C. H. Smith.”
On the 10 th of February, Leet gave a trust deed to Chas. H. Smith on all the lots which had been theretofore conveyed to him to secure the performance of the contract. By it the Colorado National Bank was made the agent of the grantee, and Leet was given the right to pay over the stipulated consideration in a specified way. It is wholly unnecessary to recite all the terms of the deed. It is sufficient to state that thereby he had the right, as fast as he might negotiate a sale *66 of any one or more of the designated lots, to pay $60.00 in cash, or not less than $30.00, and the balance of the stipulated price per lot by the promissory note of the maker, which cash and notes were to be deposited in the Colorado National Bank to the order and credit of the grantee in the trust deed. Whenever payments were thus made, Smith was obligated to execute to the purchaser or purchasers releases, and take the cash and the notes, which were to be secured by trust deeds on the lots, in exchange for that proportion of Leet’s liability under his contract. This general plan regarding the sale and transfer of the lots went on until near the expiration of the term fixed by the contract. On the 6th of October, 1887, a little more than four months before the. absolute maturity of the original agreement, the extension above recited was indorsed on the paper. Prior to this extension, Leet had sold a good many of the lots, and paid the cash consideration and procured the execution and delivery of the notes according to the stipulation. The present appellee, Black, bought sundry lots embraced in the original conveyance in January, 1889, after the maturity of the original contract, though within the extension indorsed on it. The lots need not be described nor specifically mentioned. When Black bought, he bought, as he states, with full notice of the trust deed and its terms and of the limitations on Leet’s authority to convey. He was fully advised of the necessity to pay the purchase price either in cash, or partly in cash and partly in notes, according to the agreement. Leet told him of the extension, and he relied on Leet’s statement when he made the purchase. About this time a controversy had sprung up between Charles H. Smith, the present appellant, and Leet, as to the proper construction of indorsement which extended the time of performance. Charles H. had obtained the title to the property, and all the negotiations and discussions were had between him and Leet. The principal differences respected the amount due on the paper and whether it did or did not bear interest after the lapse of the five years. The original agreement provided *67 the contract should only bear interest from maturity, and it was insisted by Leet the extension made this part of the agreement operative arid binding during the extension. Smith contended the extension did not affect his right to interest. In anticipation of difficulty respecting these releases, Black went to Smith to induce him to accept the price he had agreed to pay. Smith refused to negotiate with Black, said the title was with .Leet, and whatever settlements were made must be made with him. There is considerable talk about a tender made by Black during some of these negotiations. This may be dismissed from consideration. It can be disposed of by the single suggestion that Black never offered Smith any money, nor has he at any time, either in this suit or the one which will be referred to later, offered to pay the purchase price directly to Smith, nor has he kept his tender good by bringing the money into court to abide the result of the action. It is well understood a tender can only be made effectual by proper profert in the bill and the production of the money in court for the satisfaction of the decree if the one who makes the tender succeeds in maintaining his action. It was not a tender. The matter will not be further referred to.
This narration brings us to the point when Black’s rights accrued. We shall defer the statement of this transaction, though it may slightly disturb the regular and chronological order of events'. We prefer to reserve it until later in the opinion, when the acts and their legal results will be conjointly stated.
We will now refer to some matters which have crept into the record which, as we view them, have very little significance in the settlement of the litigation. On the 7th of February, 1889, Leet brought a suit in the district court of Arapahoe county against John W. Smith, the original grantor, and Charles H. Smith and John W. Horner, who were the grantees and the trustees in the deed of trust. No attempt will be made to fully state the contents of the bill, the relief prayed, or the decree which was entered. Its general.history *68 will be given and our conclusions about it stated, that it may be eliminated from the farther consideration of the court in the ultimate progress of this litigation. By the allegations of his bill, Leet claimed to have deposited in the bank $11,655, in money and notes, which was, as he contended, enough to pay the balance due under his original contract. He prayed its cancellation and a decree compelling Smith to execute releases for the lots which should be subject to the trust deed at the date of the judgment. Some sort of a deposit of money and notes was made in the bank. What form the deposit took, or how, if at all, it could ever have been made available to Leet, either as a payment of his obligation or as a discharge of the lien of the trust deed, nowhere appears. It may be remarked that, in the present case, the court certainly concluded the $9,000 in cash and the note for $2,655 were never deposited in the Colorado National Bank for the benefit of Mr. Smith. The court stated if it became essential to consider this question in the case, he should find there was no proof of a deposit which was in any wise a compliance with the terms of the obligation. We must conclude, therefore, the deposit was not made according to the terms of the trust deed. There was an attempt to deposit $3,120 in behalf of Mr. Black, as will be subsequently stated. Notwithstanding this, Black, the plaintiff in this suit, produced the decree which had been entered in the litigation between Leet and Smith. This decree recited the deposit of this sum ; it granted a perpetual injunction against the sale of the property which is involved in the suit now under consideration, on Leet’s giving a bond in the sum of $4,000 pending an appeal to the supreme court; it ordered Smith to execute releases on the deposit for him of $9,000, and notes for $2,655, secured by trust deeds. The decree likewise states the note was paid before maturity, and adjudged it null and void. It is somewhat anomalous, and the scope of it is not made clear by anything found in the present record. The releases were to be executed on the deposit of the $9,000 and the notes in the Colorado National Bank to the credit of Smith, and the *69 cancellation of the agreement was manifestly conditional on this deposit. Notwithstanding this, the decree in terms declared the agreement canceled, null and void. Smith appealed. Leet gave a bond for $4,000 and took out of the bank the $3,120 which had been deposited in Black’s interest. It would appear that a total deposit of $11,655 in money and notes had been made, but in May, which was the date of the decree, whatever had been deposited was withdrawn from, the bank preparatory to the commencement of this suit.
As we view the record, all this proof respecting that antecedent suit, and what was done under it, is not of the slightest consequence in the settlement of the present controversy. Black did not buy after the entry of that decree nor in reliance on it. His purchase was made before it was rendered. He bought in February, 1889, and the decree was entered on the 15th of May following. We are unable to see how he can gain any benefit from it, or how he can strengthen his title or claim his rights are affected by its terms. In anjr event, the decree was conditioned upon the payment of the $11,655, and unless he makes proof that the money and notes were deposited in the bank to the credit of Smith, according to the terms of the agreement, no advantage could come to him from the judgment, because it was conditioned upon the performance of those acts which the judge trying the present case found as a matter of fact were not performed. We are wholly unable to understand how he can predicate any claim on the formal annulment of the agreement, for it is evident this clause must be controlled by the antecedent condition. Since it is evident something was due under the agreement, and Leet was bound to pay the amount of money, or deposit some money and a certain amount of notes, which would make the two the equivalent of the amount due, the agreement could not have been canceled except on the condition of performance by Leet. The decree cannot be otherwise construed. There was no attempt in this suit to show performance, and, without it, the decree would not' be effectual. Even if Black had been a party, *70 whereby he was both bound by the judgment and possessed of the right to insist on the benefits flowing from it, he was equally obligated to show performance if he would insist the decree was operative either in effectuating his claims or in overcoming the defense which Smith put in. Having failed to offer proof to this point, the decree may be dismissed from consideration.
We likewise find many other agreements and contracts between Leet and Smith which were introduced apparently to show a reduction in the amount due Smith, and a waiver of his rights under the trust deed. After the controversy had arisen, and after the first suit was begun, there was some agreement respecting the matters, though Leet and Smith differ as to the terms and conditions of it. Some memoranda in writing are produced which show a statement of the sums due, and apparently exhibit a decided reduction from the sum of the original contract. They contain nothing, however, which operates to release the trust deed, destroys its lien, or deprives Smith of the rights which he acquired thereunder. The most they amount to is an adjustment of the sum due from Leet to Smith. In case of foreclosure, it may be this settlement would determine the sum for which the property might be sold. We cannot understand what effect these things have on Black’s rights. He was neither a party nor a privy. He neither bought on the strength of them, nor does he hold title under them. His right to an unincumbered title had its inception, if at all, on the 4th of February, 1889.
If we were not entirely satisfied the plaintiff acquired no rights by his acts, and did not thereby become entitled to maintain his bill, we should still be compelled to reverse the case because of his failure to show a compliance with the conditions of the deed. The title stood in Leet by an agreement with the owner, subject to the payment of the consideration in the form and within the time specified in the security. When Black bought of Leet, he bought subject to the same conditions and became obligated to perform .them. Black’s purchase was subsequent to the maturity of the original agree *71 ment, though within the extension. Without attempting the utmost accuracy in the statement of amounts, it is enough to say Black bought lots which bound him to pay $3,120 to have the trust deed released. This sum he was bound to pay, either wholly in cash or partly in cash and partly in notes. We do not conceive Black was bound to comply with the terms of these subsequent arrangements in order to acquire title. When he bought, he had a right to acquire title through Leet, on performance of the original conditions. Had he done this, and had he paid the money into the Colorado National Bank directly and in accordance with the requirements of the contract, or had he procured Leet to do it for him, and been exact in his observance of the stipulations, he would have acquired an equity which he might enforce against the original grantor, Smith. It is on this proposition that the plaintiff failed in his proof. Black did not show that he paid $3,120 into the bank, either by himself or througli Leet, as the purchase price of the lots which he bought. What he did can only be gathered from his own and Leet’s testimony. Black did not produce the cashier of the bank, or any officer of it, to show what was done, nor did he offer proof of any deposit in the bank to the order and credit of Smith, whereby the money became S'mith’s, and his title to* the lots was relieved from the obligations to pay the purchase money. It is impossible to extract, conceive, and state this transaction, and leave it an unvarnished tale. It has all the earmarks of an attempt to appear to observe an agreement and yet break it. The court did not find as a matter of fact that the deposit was made in the bank by Leet to the order of Smith, or to the credit of the holder of the note. What the court said is: “ Thereupon the plaintiff handed over in the bank, to Mr. Leet, a sufficient amount of money to pay what was required to secure the releases of the lots owned by him and Mr. Leet, deposited the same in the Colorado National Bank, as I suppose, to the credit of the holder of the note. Neither any of the officers of the bank nor any of the books, of the bank were brought into court, so that the exact terms *72 of the deposit do not appear. It does sufficiently appear that the deposit was actually made.” Nothing further is contained in the opinion, either by way of findings or otherwise, respecting the deposit. We are therefore unhampered by the rule that the findings of the court on questions of fact are conclusive. The court did not find directly that Black’s money was deposited in the bank to the credit of Smith, or-to the credit of the holder of the note. He assumes it, but there cannot be found between the four corners of the record any evidence which would justify a finding that the money was thus deposited. We will now inquire what was done.
Black was entirely informed respecting the condition of the title and the terms under which Leet held it. He was advised there were some differences between Leet and Smith in reference to the property and the execution of releases. In response to a question what he knew about it, he said: “ Don’t know whether it was before or after I knew of the difference existing between Mr. Leet and Mr. Smith that I had the conversation with Mr. Smith. I knew I had the money to pay for the releases ; I wanted the lots released as soon as I could; I knew it was the lots under trust deed; didn’t know at the time I made the offer to Mr. Smith that Mr. Leet and Mr. Smith were having certain differences and that a lawsuit was threatened. Mr. Leet had informed me that if Mr. Smith didn’t release he was going to commence suit. When I traded for these lots, Mr. Leet wanted to get the money to pay this note.” He was well advised concerning the probability of a lawsuit, but was anxious to get the lots to make a stock yard of them. He states : “ I was anxious to get all the lots so I might make a stock yard of them and wanted to get them clear, and we traded with the idea that he must release on the 10th of February, 1889. That is what Mr. Leet gave me to understand, and what the trust deed read. When the time came I presented the money.” He was likewise informed the money must be paid into the bank. His answer to a question concerning it is: “ The trust deed read that we should pay the money into the bank, *73 ■whoever owned the lots. The owner of the lots is the man to pay the trustee, I think.” He likewise knew the note fell due in 1888, though he had been told by Leet it had been extended for a year. His only information respecting the extension was what he had learned from Leet. He never saw the note. Being thus advised of the terms of the instrument, Black attempted, on the 4th of February, to do what was necessary to complete his right to a release of the trust deed as to his lots. What he did is best told in his own language : “ Q. Isn’t it a fact that the entire deposit that was made on account of this note, was made in the name of John E. Leet, and was not made in your name at all? A. I could not say how that is. I took the money there ; I never saw the receipt that Mr. Woodelton gave Mr. Leet. Mr. Woodelton said it was Mr. Leet’s note and the deposit would have to be made by him and he would give Mr. Leet a receipt for the money, and Mr. Leet gave me such a receipt as I wanted. It was done in that way. I wanted the two Neven lots and bought them through Mr. Leet as agent, and gave him the $120 on the two lots a few days afterwards. I had a contract from Mr. Leet signed by him as agent for Mr. Neven. I paid Mr. Leet $120, and took his receipt. I didn’t take the $120 to the bank.” When this money was put into the bank, he took a receipt from Leet, which substantially recited Black’s payment to him of $3,120 to apply on the trust deed. This receipt was signed by Leet, made out on Leet’s office paper, and under circumstances which will appear when Leet’s testimony is commented on. Black subsequently learned the money had been taken out of the bank. He became uneasy about it and went to Leet, and August 7,1889, obtained an agreement, whereby Leet agreed to pay 10 per cent per annum on the money as compensation for the delay in procuring the release. Black states that from February 4th on, he knew the lots which he had attempted to buy from Leet were subject to the payment of $60.00 per lot and that they could not be released until that sum had been paid. This is all to be found in Black’s testi *74 mony respecting the payment to the bank, and his attempt to entitle himself to the release from Smith and the completion of his title. Clearly there is nothing in this evidence which even tends to show a payment in conformity with the conditions of the trust deed. Black bought under its shadow with full knowledge of its existence and of what he was bound to do to secure an unincumbered title, and nothing in the litigation between Leet and Smith, and nothing which was done by way of the execution of new agreements, at all relieved him from the burden which he assumed when he bought. His deed was subject to the incumbrance, and he assumed and agreed to pay his proportionate part of it. If it be admitted Leet succeeded in procuring a reduction of the sum which he was bound to pay on the whole property conveyed by Smith, Black was not entitled to share in any part or portion of that advantage, but was bound to pay the $60.00 per lot, either in cash, or in cash and notes, according to the agreement. Whether he was further obligated to pay interest we are not required to determine. All we are deciding is whether what Black did amounted to a compliance with the terms of the deed regardless of the question of interest.
We now come to a more definite history of this particular transaction, which can be best understood by a transcript of Leet’s testimony. It furnishes its own definition, and can be best understood and appreciated without other comment or criticism than what is furnished by its own terms and substance. We will permit Leet to describe it. “Q. I want to know if you know that fact, that he brought that money $3,120 at one time, and do you know of his depositing that in the Colorado National Bank? A. Yes, sir; I think I was there with him when he did it. Q. You may state what was said; the substance of what was said by you. A. The money was put there in escrow, I suppose you might call it; it was put there for Mr. Smith in compliance with the peculiar terms of the trust deed.” Leet goes on to state that he does not remember the transaction as to its precise words, but he has *75 a clear recollection of its substance and he states: “ A. The substance of it was that money was put up by him in order to comply with Smith’s demand and the demand of the trust deed. Q. I am speaking about this $3,120. A. Black assumed this amount and Smith refused to receive it from him he said. Q. What did he do with that money, that $3,120 ? A. Went down there and put it up for Mr. Smith and had him notified that it was there, but the notification that I had deposited that. Q. What date was it when you were there at the bank when this $3,120 was deposited? A. I do not remember the date ; it was previous to the time of bringing the suit. Q. And it was preparatory to bringing that suit that this money was so deposited, was it not? A. It is because Mr. Smith had refused to accept it, according to the terms of the trust deed. * * * I was getting ready to bring an injunction or mandamus to compel him to take the money and release the lots.” Leet undertakes to give a lengthy explanation of the reasons which led him to make this particular deposit, and, omitting what he says in regard to Smith’s antecedent personal receipt of money and as to the dispute with reference to the sum which he was bound to pay, as he says, to save expense, and at their request, and to comply with the terms of the deed, he continues : “ I had them hand me the money and I tendered it to Mr. Smith through the bank in this process required by the trust deed. Now then Mr. Black in handing me this money wanted some evidence that he had furnished some money to pay Mr. Smith for this trust deed which he refused to receive either from him or from me.” Leet gives some explanations of the reasons for his proceeding which need not be recited, and then goes on to state in his own fashion that he had had some talk with Black and the other purchasers, with reference to the obtainment of releases and what he intended to do, and says: “ Q. And then did you inform Mr. Black that you would commence a suit to compel Mr. Smith to make this release— talk the matter over of commencing the suit ? A. Yes, sir ; with all of them—about fifty others besides Mr. Black. *76 Q. And was it then that Mr. Black furnished this $3,120 ? A. Yes, sir; he did not want to do it. I don’t recollect whether the receipt to Black was given before going to the bank, or afterwards; it was at the same time, either at my office or at the bank; it may have been written at the office and delivered at the bank. Q. And this deposit, when it was made in the bank, was made by you so that it could be a tender given by you to Mr. Smith on account of this note. Is that the way of it? A. Yes, sir; it had been previously offered to Mr. Smith by Mr. Black himself, direct.” This is the only evidence which the plaintiff offered of a payment into the bank. How the money was paid, under what circumstances, on what conditions, to whose order, nowhere transpires. We are unable to find out whether or not any payment was made in accordance with the terms of the trust deed. This the plaintiff was undoubtedly bound to show if he would obtain the relief which was the object of his bill. The trial court supposes the money was paid in to the credit of Smith. We are unable to indulge in that supposition, and, on the other hand, we are well satisfied to conclude no such payment was made into the bank at all. The suit of Leet v. Smith, to which reference has been made, was tried in 1889, and in that suit Leet gave testimony and some part of that testimony was read over to him and he was interrogated about it on the present trial, and this is the result: “ Q. Did you testify in that case that Mr. Black furnished this $3,120 ? A. I have no doubt that I testified that in that case; and I did testify just as I have in this case, because that is the truth, so far as truth is, that is what I testified to. Q. I ask you if in that case you did not testify that this $3,120 was your own money ? A. I say that I can only guess now, without going over that evidence, as to what I testified to—but I have every reason to believe, and I am entirely sanguine, that I testified to what was the truth ; and that if I testified that it was my own money, it was because the lawyers objected to my getting in the truth about it. Q. I will ask you if this is a correct transcript of the evidence given by *77 you in this other case: ‘ Did you keep a memorandum of the deposit in the Colorado National Bank of the cash or notes upon which notice was given to Mr. Smith to execute these releases ? A. Yes, sir. Q. Will you give the amount in cash and the lots for which the release was demanded in the first escrow ? A. I put up four escrows just as fast as I could rake and scrape the money before it became due. On the 4th of February I deposited for Mr. Smith $8,120, anda release to be signed for lots 7 to 24, 27 to 39, in block 16 ; lots 25 to 45, in block 14. Now, I left releases for all of these lots and left $1,560 in cash and $1,560 in one of the purchaser’s notes, secured by trust deed, all executed and ready for delivery. After that was paid up we left that until the 11th, which covered the 10th. Afterwards it was taken down and the purchaser’s notes withdrawn and the whole amount of $3,120, put up in cash by the three purchasers.’ A. I don’t; but I have no doubt but that it is correct. ' The essential thing that I remember is, that all the money was paid when the injunction was obtained, and when the trial was off; and it is my recollection that it was up there all the time between the injunction and the trial. That evidence was given in what year ? Q. 1889. A. That is five years ago. There is a great many things that I can’t remember five minutes.” There is something further in Leet’s testimony which throws some light on this transaction : “ Q. When you tendered it to the bank and deposited it there in the bank, it was a deposit made by you, was it ? A. Yes, sir. I don’t remember how long this money remained in the bank; it remained there until after the trial; the money was there at the time the decree was signed, on May 15, 1889; it was there the day the injunction was brought, and up to the time of the trial, and after the decree was signed, and until Judge Stuart told me that I could give a bond and take it out, pending the appeal to the supreme court. Q. That is the $5,000 or $4,000 bond provided in the decree ? A. Yes, sir. Q. Did you take out the money after you had given the $4,000 bond to appeal to the *78 supreme court? A. Yes, sir; took the whole $11,165, of which this was a part. Q. You took it all out at that time? A. Yes, sir. Q. That would be about some time in May, 1889 ? A. Yes, sir. Q. The decree is signed May 15, 1889 —about that time, was it? A. Yes, sir. I don’t remember when I first told Mr. Black of my having withdrawn this deposit. I think I told him before the year 1890. Whether it was three weeks or ten months, I could.not say. Mr. Black came to me and wanted to know how long that money had to stay up. I told him it had to stay up until the supreme court decided the case.”
This history of the case enables us to conclude there was never at any time any payment to the Colorado National Bank to the credit of Chas. H. Smith. Courts must be presumed to have some knowledge of the methods by which banks transact business. We know as well as everybody else who has ever done business with a bank that money cannot be paid into a bank to the credit of A. and be drawn out by B. without A.’s signature. No solvent financial institution would turn over to B. A.’s money, or that which had become A.’s money, without his authority, or at all events without a guarantee from B. to guard against any claim which A. might make. We cannot assume there was any transaction of the latter description, because there is no evidence of it. There is a wide distinguishing difference between an unconditional and a conditional deposit of money where it is made under a contract which requires the payment of money either to effectuate a transfer of title or divest a lien. If the money was paid into the bank by either Black or Leet for Smith’s benefit without conditions which would limit or modify its effect as a payment, it would undoubtedly be operative to satisfy the contract and establish Black’s equitable right to a release of the trust. An actual credit of it on the books of the bank would be wholly unnecessary so long as it was paid in without conditions which would nullify its effect. If the bank failed in its duties as Smith’s agent, Black could not be held responsible for this neglect or fail- *79 me to protect the principal unless it proceeded from restrictions laid on the deposit when it was made. We are then remitted to the single query, whether from what is contained in the record, we have a right to assume the $3,120 was paid into the Colorado National Bank for Smith in accordance with the terms of the trust deed. There is no evidence which convinces us this was done. The appellee’s bill and his whole case rested on proof of this one fact. It was a fundamental matter which he was bound to establish to the entire satisfaction of the court to obtain any relief under the action as he had conceived it. Failing in this, he was not entitled to the judgment which he obtained, nor can he maintain it on this appeal. It is quite possible he may be able to settle this matter to the satisfaction of the court on the succeeding trial, and he may be able to prove that the money was actually paid in for Smith’s benefit as the deed provided and that Smith declined to accept it because it did not include the interest, and that the bank subsequently permitted Leet to withdraw it on the execution of what was to it an adequate security.
What we have suggested in the case aside from this principal proposition on which we put it will undoubtedly relieve the subsequent trial of considerable embarrassment and take out of the record many of those things which we regard as wholly immaterial to the issue. We are entirely clear, the only way by which Black can ever substantiate his right to a title freed from the lien is by clear and specific proof either of the payment of the consideration money or its deposit in the bank for the grantor’s use. In other words, we conclude Black cannot take Smith’s land without paying for it, nor can he compel Smith to look to Leet for the payment of that money. There is nothing in the record to determine the responsibility of these parties, nor do we think Smith is bound to imperil his rights by looking to the one or the other. The financial responsibility of either Black or Leet in no wise affects Smith’s rights or Smith’s claims. He cannot be divested of his lien except by the payment of the money or *80 by his own voluntary act. A deposit in the bank which could under the conditions on which it was put in be drawn out and was drawn out by the depositor Leet, is in no legal sense a compliance with the terms of the contract. The deposit must have been irrevocable, or if not irrevocable must have been so made as to discharge both Black and Leet from any further responsibility, which must have been shifted by the transaction to the bank itself or else it was of no value for any purpose. Smith has a right to insist on either the land or his money. His title can only be divested by an exact observance of the contract by which he agreed to surrender his interest in the land. We are unable to discover any such compliance in this record.
The judgment of the court below was not in harmony with our views of the case and the judgment will be accordingly reversed and the case remanded for a new trial in conformity with this opinion.

Reversed.